

FILED

Jul 16 2019, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher J. Evans
Dollard Evans Whalin LLP
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Patrick Neil Tinker,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

July 16, 2019

Court of Appeals Case No.
18A-CR-2880

Appeal from the Hamilton
Superior Court

The Honorable J. Richard
Campbell, Judge

Trial Court Cause No.
29D04-1602-F6-1201

**Crone, Judge.**

# Case Summary

Patrick Neil Tinker appeals his convictions, following a jury trial, for level 6 felony dealing in marijuana and class B misdemeanor possession of marijuana. During a valid traffic stop of Tinker's vehicle, police officers conducted a dog sniff around the vehicle. After the canine alerted to the presence of an illegal substance, officers searched the vehicle and found marijuana in the trunk. Tinker unsuccessfully moved to suppress the evidence obtained during the search, arguing that the dog sniff prolonged the traffic stop in violation of his constitutional rights. The evidence was subsequently admitted at trial over his renewed objection. The sole restated issue on appeal is whether the trial court abused its discretion in admitting the evidence obtained as a result of the search. Finding no abuse of discretion, we affirm.

# Facts and Procedural History

On February 16, 2016, Fishers Police Department Officer Joseph Hancock was on street patrol conducting traffic stops on Interstate 69. At approximately 11:27 p.m., Officer Hancock was in his fully marked police vehicle parked in the median near exit 206 when he observed a vehicle heading northbound make "some lane movements." Tr. Vol. 2. at 105. Specifically, the vehicle was "in the left lane, [and] quickly jumped over to the right without proper signaling" and then "moved back into the left lane[.]" *Id*. After Officer Hancock started following the vehicle, the driver "switched again to the right lane without proper signaling" and then at one point "straddled two lanes of traffic." *Id*. Officer Hancock remembered observing the same vehicle traveling southbound

on Interstate 69 approximately forty-five minutes earlier, when he saw it make rapid lane changes and slam on its brakes; he had been unable to "get out on it" safely so he did not attempt a traffic stop at that time. State's Ex. 1.

[3] Officer Hancock activated his emergency lights and initiated a traffic stop of the vehicle a little after 11:27 p.m. Officer Hancock approached the passenger side of the vehicle and asked both the driver and the passenger for identification and spoke to them briefly about where they had been and where they were going. The men indicated that they had traveled from Fort Wayne to Indianapolis and were returning to Fort Wayne. Tinker was the driver and Jerome Dowdell was the passenger. Both Tinker and Dowdell "appeared nervous" and "wouldn't make eye contact" with Officer Hancock, and their "breathing was a little elevated." Tr. Vol. 2 at 107. Officer Hancock collected each man's identification and returned to the police vehicle. At that point, Officer Hancock requested an assisting officer because he "knew that [he] was going to get the driver out and explain the warning to him and to talk to him a little more" and "[i]t's just standard practice to officer's safety to always have another officer there." *Id.* at 15. Officer Hancock also called for a canine unit. Officer Hancock did so because he believed it was strange that the two men had stated that they were headed back to Fort Wayne from Indianapolis. Having remembered seeing that same vehicle just forty-five minutes earlier, Officer Hancock thought that was an uncommonly "quick turnaround." *Id.* at 107.

[4] Officer Hancock ran background checks on both Tinker and Dowdell and remained in his police vehicle until an assisting officer arrived on the scene at

11:36 p.m. Officer Hancock spoke with the assisting officer and informed him that his background checks revealed prior drug and handgun possession charges against both Tinker and Dowdell.[1] At almost 11:38 p.m., Officer Hancock returned to Tinker's vehicle and asked Tinker to step out of the vehicle. As Tinker opened the door and exited the vehicle, Officer Hancock could smell the distinct odor of raw marijuana. Officer Hancock asked Tinker if he could pat him down, and Tinker consented. Then Officer Hancock explained to Tinker exactly why he pulled him over, and he stated that he planned to give Tinker only a verbal warning for the traffic infractions. Officer Hancock also questioned Tinker to clarify where he and Dowdell came from and where they were headed. Tinker told Officer Hancock that they were from Fort Wayne and had come to Indianapolis to a barber shop either to meet a friend or to get a haircut, and now they were headed back to Fort Wayne.

[5] At 11:40 p.m., Officer Hancock requested Dowdell to also exit the vehicle in order to ask him the same questions, and while he was speaking to Dowdell, at 11:41 p.m., the canine unit was on the scene and immediately did a walk around the vehicle. The canine quickly alerted on the vehicle, and a subsequent search of the vehicle's trunk revealed 3.45 pounds of marijuana packaged in

---

[1] As noted by the State, the jury was not made aware of any criminal history information gathered by Officer Hancock during the background checks due to a motion in limine which was granted by the trial court. Appellant's App. Vol. 2 at 132. The Pre-Sentence Investigation report reveals that, prior to the current case, Tinker had been twice charged with carrying a handgun without a license, and he had one conviction for class B misdemeanor possession of marijuana. *Id.* at 142.

vacuum-sealed bags. Officers also found two cell phones during the search of the vehicle. Tinker and Dowdell were arrested.

[6] The State charged Tinker with two counts of level 6 felony dealing in marijuana, and two counts of class B misdemeanor possession of marijuana. Tinker filed a motion to suppress the evidence obtained as a result of the search of his vehicle. Following a hearing, the trial court entered an order denying the motion to suppress. A jury trial was held on August 30, 2018. During trial, Tinker renewed his objection to the admission of any evidence obtained as a result of the search of his vehicle. The trial court overruled his objection and admitted the evidence. The jury found Tinker guilty of one count of level 6 felony dealing in marijuana and one count of class B misdemeanor possession of marijuana.[2] The trial court sentenced Tinker to 730 days, with sixty days executed in the Department of Correction, 305 days on home detention, and 365 days suspended to probation. This appeal ensued.

## Discussion and Decision

[7] Tinker asserts that the trial court abused its discretion in admitting evidence seized during the search of his vehicle. Our supreme court has explained our standard of review when, as here, a defendant fails to seek interlocutory review of the trial court's denial of a motion to suppress, and the matter instead proceeds to trial.

---

[2] The trial court granted the State's motion to dismiss the other two counts.

We consider th[e] appeal a request to review the trial court's decision to admit evidence. The trial court has broad discretion to rule on the admissibility of evidence. Rulings on the admissibility of evidence are reviewed for an abuse of discretion and ordinarily reversed when admission is clearly against the logic and effect of the facts and circumstances. However, when a challenge to such a ruling is predicated on the constitutionality of the search or seizure of evidence, it raises a question of law that we review de novo.

*Thomas v. State*, 81 N.E.3d 621, 624 (Ind. 2017) (citations omitted). We will uphold the trial court's ruling on the admission of evidence during trial if it is sustainable on any legal theory supported by the record, even if the trial court did not use that theory. *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008).

[8] Tinker does not challenge the validity of his initial traffic stop, nor could he, as "[i]t is unequivocal under our jurisprudence that even a minor traffic violation is sufficient to give an officer probable cause to stop the driver of a vehicle." *Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013). Moreover, it is well settled that a dog sniff is not a search protected by the Fourth Amendment or Article 1, Section 11 of the Indiana Constitution. *Id.*[3] "Accordingly, no degree of suspicion is required to summon the canine unit to the scene to conduct an exterior sniff of the car or to conduct the sniff itself." *State v. Hobbs*, 933 N.E.2d 1281, 1286 (Ind. 2010).

---

[3] "[B]oth provisions preserve the right of people to be secure in their persons, houses, papers, and effects, from unreasonable search and seizure[.] *Austin*, 997 N.E.2d at 1034.

[9] A narcotics dog sweep, however, becomes "an unreasonable investigatory detention if the motorist is held for longer than necessary to complete the officer's work related to the traffic violation and the officer lacks reasonable suspicion that the motorist is engaged in criminal activity." *Austin*, 997 N.E.2d at 1034. In *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015), the United States Supreme Court explained that the tolerable duration of a seizure is dictated by the seizure's particular "mission." In the context of a traffic stop, an officer's mission is to address the underlying traffic violations that warranted the stop and attend to related safety concerns. *Id.* This includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance. *Id.* at 1615. While "[t]hese checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly[,]" a canine sniff, "by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)). Thus, a traffic stop "prolonged beyond" the "time reasonably required to complete [the stop's] mission" is "unlawful." *Id.* at 1616 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, ... but whether conducting the sniff prolongs—i.e., adds time to—the stop." *Id.* (quotations omitted). The burden is on the State to show that the time for the traffic stop was not increased due to a canine sniff. *Wells v. State*, 922 N.E.2d 697, 700 (Ind. Ct. App. 2010), *trans. denied*.

The basis of Tinker's challenge is that Officer Hancock extended the traffic stop beyond the time required to reasonably complete the tasks tied to the traffic infraction for the sole purpose of getting a canine officer on the scene, and in doing so violated his constitutional rights.[4] In other words, Tinker asserts that conducting the dog sniff unlawfully prolonged his traffic stop. Based upon the record before us, we disagree.

This Court considered facts somewhat similar to those presented here in *Hansbrough v. State*, 49 N.E.3d 1112 (Ind. Ct. App. 2016), *trans. denied*. In *Hansbrough*, an officer legally stopped Hansbrough for "following less than one second of braking distance behind another vehicle." 49 N.E.3d at 1113. The officer asked Hansbrough, the sole occupant of the vehicle, for his license, registration, and insurance information, and also asked Hansbrough where he had come from and where he was headed. *Id.* While speaking with Hansbrough, the officer "observed what he believed to be marijuana 'shake'" near the cup holder and, based on this observation, suspected the presence of drugs. *Id.* (record citation omitted). Accordingly, the officer called for a canine

---

[4] Tinker asserts that the question of whether the stop was unreasonably prolonged was already determined by the trial court in denying his pretrial motion to suppress and that this Court must now give due deference to such determination. *See* Appellant's Br. at 13; Reply Br. at 4 n.2 (noting that the trial court stated that it was considering solely the issue of whether Officer Hancock had reasonable suspicion to "prolong the traffic stop in order to conduct a canine sniff" and reasoning that, as a threshold matter, the trial court "must have concluded" that the traffic stop "was in fact prolonged.") First, we do not necessarily agree with Tinker as to what the trial court did or did not conclude as a threshold matter in denying his motion to suppress. Moreover, we remind Tinker that he appeals the trial court's evidentiary ruling after a completed trial and not the trial court's legal or factual conclusions in ruling on his motion to suppress. As stated above, we will affirm the trial court's evidentiary ruling if it is sustainable on any legal theory supported by the record. *Rush*, 881 N.E.2d at 50.

unit to come to the scene. The officer then sat in his patrol car and began typing out a warning ticket and running a records check on Hansbrough. The officer returned once to Hansbrough's vehicle to verify his address. *Id.*

[12] Within fourteen minutes of the commencement of the traffic stop, the canine unit arrived at the scene. *Id.* At that time, the officer was on the phone checking for any outstanding warrants and had not yet completed his paperwork for the traffic stop. *Id.* Sixteen minutes after the traffic stop first began, and while the officer was still on the phone checking for outstanding warrants, a dog sniff was conducted around the vehicle, and the dog "alerted to the presence of narcotics." *Id.* Following the alert, the officers searched Hansbrough's car and found a handgun underneath the driver's seat. *Id.* at 1114. The handgun evidence was subsequently admitted at Hansbrough's trial over his objection. Hansbrough appealed and, based upon the facts, this Court found that the dog sniff of Hansbrough's vehicle was conducted before the traffic stop was completed and therefore, the stop was not prolonged by the dog sniff. *Id.* at 1115. Accordingly, we held that the trial court did not abuse its discretion in admitting the evidence found as the result of the dog sniff. *Id.*

[13] Similarly, here, the record reflects that the canine sniff did not, in fact, measurably prolong the traffic stop but instead was conducted within the time reasonably required to complete the stop's mission. After the initial stop occurred at 11:27 p.m., Officer Hancock spent several minutes doing vehicle registration and background checks on both Tinker and Dowdell, and then he spent the next several minutes waiting for an assisting officer (not the canine

unit) to arrive, which finally occurred a little after 11:36 p.m. This delay was reasonable for purposes of officer safety. *See Rodriguez*, 135 S. Ct. at 1616 (noting that "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.").

[14] Once the assisting officer arrived and Officer Hancock spent a brief amount of time getting him up to speed about the circumstances surrounding the traffic stop and the results of his background checks, Officer Hancock reapproached Tinker's vehicle around 11:38 p.m. and asked Tinker to exit the vehicle with the purpose of giving him a verbal warning explaining the infractions that warranted the stop. After conducting a patdown for weapons and then explaining the infractions to Tinker as well as further clarifying Tinker's and Dowdell's comings and goings that night, Officer Hancock asked Dowdell to exit the vehicle at 11:40 p.m. so he could make the same brief inquiries regarding the purposes and intended destination of the men's travel.[5] The canine unit arrived on the scene and conducted the sniff one minute later, a mere fourteen minutes after the initial stop, while Officer Hancock was still in the midst of speaking with both Tinker and Dowdell. "An officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those

---

[5] Tinker's claim is directed only at the duration of the traffic stop. He does not challenge Officer Hancock's actions in requiring him to exit his vehicle or in conducting a patdown search upon his exit of the vehicle. We note that while concern for officer safety may justify ordering a driver and passengers out of the car, it does not by itself justify a patdown search. *Mitchell v. State*, 745 N.E.2d 775, 780 (Ind. 2001). However, our review of the police dash cam evidence reveals that Officer Hancock asked Tinker if he could conduct a patdown search, and Tinker consented.

inquiries do not measurably extend the duration of the stop." *Curry v. State*, 90 N.E.3d 677, 686 (Ind. Ct. App. 2017) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)), *trans. denied* (2018).

[15] Under the circumstances presented, we conclude that the State met its burden to show that the canine sniff did not measurably prolong the duration of the valid traffic stop.[6] The canine alerted while the traffic stop was ongoing and before Officer Hancock had completed the mission of the stop. Therefore, the subsequent search of Tinker's vehicle was not rendered invalid and the trial court did not abuse its discretion in admitting evidence obtained during that search. We affirm Tinker's convictions.

[16] Affirmed.

Bradford, J., and Tavitas, J., concur.

---

[6] Even if we were to assume that the traffic stop was prolonged beyond the stop's "mission" in order for the canine unit to arrive and conduct the sniff, the record indicates that Officer Hancock obtained information during the course of the stop that would have given him reasonable suspicion of criminal activity. Namely, Officer Hancock testified that when he asked Tinker to exit the vehicle with the purpose of giving him a verbal warning explaining his infractions, Officer Hancock smelled the distinct odor of raw marijuana. It is well settled that information lawfully obtained during a traffic stop may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation, including a dog sniff. *Hansbrough*, 49 N.E.3d at 1115 n. 5. Therefore, we conclude that any delay that was, in fact, caused by the canine unit was permissible under both the Fourth Amendment and Article 1, Section 11 of the Indiana Constitution.